UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

SECURITIES AND EXCHANGE
COMMISSION                                       :
 Plaintiff,                                      :
                                                 :
   v.                                            : Civ. No. 13-CV-1047(AVC)
                                                 :
CHAD C. McGINNIS and SERGEY                      :
PUGACH                                           :
 Defendants,                                     :
                                                 :
BELLA PUGACH,                                    :
   Relief Defendant.                             :

**<u>RULING ON THE PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION</u>**

This is an action for equitable relief filed pursuant to Section 21(d) of the Securities Exchange Act of 1934 (hereinafter the "Exchange Act") in which the Securities and Exchange Commission (hereinafter the "SEC") seeks disgorgement of all ill-gotten gains, prejudgment interest, and civil penalties pursuant to Section 21A of the Exchange Act. The SEC asserts that the defendants, Chad C. McGinnis and Sergey Pugach, executed an insider-trading scheme using Green Mountain Coffee Roasters, Inc.'s (hereinafter "GMCR") nonpublic information ahead of earnings announcements.[1]

On July 24, 2013, this court granted an *ex parte* emergency temporary restraining order filed by the SEC

---

[1] Additionally, trades were made ahead of an earnings announcement in a trading account of the relief defendant, Bella Pugach, Sergey Pugach's mother.

1

which: (1) enjoined the defendants, Chad McGinnis, and Sergey Pugach, from violations of federal securities laws; (2) froze funds and other assets of the defendants and the relief defendant, Bella Pugach; (3) provided for expedited discovery; (4) provided for alternative service by the Commission; (5) prohibited the destruction or alteration of documents; and (6) set the matter for a preliminary injunction hearing.

On October 29-31, 2013, the court conducted the preliminary injunction hearing and heard testimony as well as arguments of counsel. The SEC, in its motion for preliminary injunction, requests the court enter an order continuing the current freeze on the defendant's assets, to enjoin the defendants from continuing to violate the securities laws, and obtaining other equitable relief, including expedited discovery.

For the reasons that follow, the SEC's motion for preliminary injunction is GRANTED in part and DENIED in part.

## FACTS

The court finds:

Chad McGinnis lives in Morrisville, VT; Sergey Pugach lives in Hamden, CT; Bella Pugach lives in Brooklyn, NY;

and GMCR is a Delaware corporation with its headquarters in Waterbury, VT.

By virtue of his position at GMCR, McGinnis was provided access to material, nonpublic information about GMCR's upcoming earnings announcements days before the information was released to the public. One of McGinnis's assignments at GMCR was to work on an internal GMCR site, referred to as the "Sales Portal," containing some sales data for the company. McGinnis would also have needed to know the "User-A"[2] login and password, giving him access to all of GMCR's computer files, in order to do his job.[3] However, it is unknown specifically at what point McGinnis received this password.

There is no direct evidence that McGinnis accessed insider information. McGinnis and the SEC stipulated that "[t]he SEC's forensics analyst has performed searches of the GMCR data in an attempt to identify forensic evidence [that] Mr. McGinnis accessed material nonpublic information

---

[2] The User-A account is an account that was created within GMCR's security administration domain for protecting file shares, administering e-mail accounts, and for administering systems and servers related to SharePoint file systems within GMCR. The permissions for the User-A account were "domain administrator level permissions," which is the highest level permissions within the entire computing system domain, giving a user control of all servers and systems.
[3] In order to access certain blocked information with a User-A account, a GMCR employee would also have to know how to "override" the access of the User-A account.

of GMCR. Those searches are not yet complete . . . At the present time, the SEC's forensic analysis has not uncovered any forensic evidence that Mr. McGinnis accessed any specific material nonpublic information of GMCR at any specific time on the private shared folders of GMCR's Finance and Legal Departments or on GMCR's Exchange Server, as alleged in the Complaint."

GMCR maintains an insider trading policy that would have applied to McGinnis. The policy states that a GMCR employee "may not trade in the securities of the Company, directly or through family members or other persons or entities, if [the employee is] aware of material, non-public information ("inside information") relating to the Company." The insider trading policy also contains a section entitled "Additional Guidance," which states that GMCR "considers it improper and inappropriate for those employed by or associated with the Company to engage in short term or speculative transactions in the Company's securities or in other transactions in the Company's securities that may lead to inadvertent violations of the insider trading laws." McGinnis admitted that he violated this latter provision. His employment at GMCR was subsequently terminated.

GMCR's stock price often moves significantly upwards or downwards after earnings announcements for the company are released.

McGinnis and Pugach are longtime friends and consider themselves to be trading partners. The two "religiously" discussed trading. It became a ritual for Pugach to travel to McGinnis's home in Vermont in advance of GMCR earnings announcements to trade in GMCR stock.

At least one of the defendants profited from GMCR trades in 12 of the 13 earning events from July of 2010 through 2013. The defendants often took either heavy bearish or bullish positions prior to the earnings announcements. Much of the defendants' profit came from trades around earnings events. However, there were also several trades made by Pugach around earnings announcements in which he lost significant sums of money. Additionally, McGinnis had a significant amount of trading and profit which occurred outside earnings announcements.

Overall, the defendants profited enormously. McGinnis started in January of 2010 with a balance of $33,000 in his trading account. By the end of the period in June of 2013, he turned the balance into about $1.8 million in gains, for a rate of return of 12,857 percent. Mr. Pugach, who started

with a balance of $249,000, turned it into roughly $4.9 million in gains, for an overall rate of return of 2,001 percent.

The SEC did not compare the returns to investors starting with similar amounts of money as the defendants, or investors trading nearly exclusively in GMCR as the defendants did. The SEC could have done a comparison in this manner by obtaining "blue sheets:" trading records from broker-dealers in specific securities and specific times.

McGinnis and Pugach conducted extensive research on GMCR and devoted a significant amount of time to trading the company's stock. The defendants employed a "straddle" strategy at times, whereby an investor buys an equal amount of put[4] and call[5] options at the same price and expiration date. When an investor uses a straddle strategy, he is

---

[4] "Call options" provide the holder the right (but not the obligation) to purchase an underlying asset at a specified price (the strike price), for a certain period of time. If the stock fails to meet the strike price before the expiration date, the option expires and becomes worthless. Investors buy calls when they think the share price of the underlying security will rise or sell a call if they think it will fall. Call Option Definition, INVESTOPEDIA.COM, http://www.investopedia.com/exam-guide/cfa-level-1/derivatives/options-calls-puts.asp (last visited Nov. 8, 2013)

[5] "Put options" give the holder the right to sell an underlying asset at a specified price (the strike price). The seller (or writer) of the put option is obligated to buy the stock at the strike price. Put options can be exercised at any time before the option expires. Investors buy puts if they think the share price of the underlying stock will fall, or sell one if they think it will rise. Put Option Definition, INVESTOPEDIA.COM, http://www.investopedia.com/exam-guide/cfa-level-1/derivatives/options-calls-puts.asp (last visited Nov. 8, 2013)

playing both sides of the market, to allow the investor to profit regardless of the direction that a stock price moves. Pugach also employed a "strangle"[6] strategy at times in his investing. By employing a strangle strategy, an investor can profit if there is a large price movement in either direction in the near future.

## **STANDARD**

Section 20(b) of the Securities Act and Section 21(d)(1)[7] of the Exchange Act empower the SEC, "upon a proper showing," to seek the Court's issuance of a "temporary injunction or restraining order." 15 U.S.C. § 77t(b); 15 U.S.C. § 78u(d)(1). The SEC, unlike a private litigant, need not show risk of irreparable injury to obtain an injunction, nor the unavailability of remedies at

---

[6] An options strategy where the investor holds a position in both a call and put with different strike prices but with the same maturity and underlying asset. This option strategy is profitable only if there are large movements in the price of the underlying asset. Strangle Definition, INVESTOPEDIA.COM, http://www.investopedia.com/exam-guide/cfa-level-1/derivatives/options-calls-puts.asp (last visited Nov. 8, 2013)

[7] Section 21(d) of the Exchange Act provides: Whenever it shall appear to the Commission that any person is engaged or is about to engage in acts or practices constituting a violation of any provision of this chapter, the rules or regulations thereunder, it may in its discretion bring an action in the proper district court ... to enjoin such acts or practices, and upon a proper showing a permanent or temporary injunction or restraining order shall be granted without bond. 15 U.S.C. § 78u(d) (1988); S.E.C. v. Unifund SAL, 910 F.2d 1028, 1035 (2d Cir. 1990)

law. S.E.C. v. Cavanagh, 1 F. Supp.2d 337, 359-60 (S.D.N.Y. 1998) aff'd, 155 F.3d 129 (2d Cir. 1998).

In Unifund SAL, the second circuit held that the "proper showing" required of the SEC is analogous to the traditional "likelihood of success" standard regularly applied to private litigants. Unifund SAL, 910 F.2d at 1037. The court, however, in applying the "likelihood of success" standard, must consider the nature of relief sought by the SEC. "Like any litigant, the Commission should be obliged to make a more persuasive showing of its entitlement to a preliminary injunction the more onerous are the burdens of the injunction it seeks." S.E.C. v. Unifund SAL, 910 F.2d 1028, 1039 (2d Cir. 1990).

With respect to a "traditional" SEC injunction, which enjoins a defendant from future violations of securities laws, a proper showing requires the SEC to demonstrate a *prima facie* case that a violation of the securities laws has occurred; and (2) a likelihood that a violation will occur again in the future. See SEC v. Cavanagh, 155 F.3d 129, 132, 135 (2d Cir. 1998); SEC v. Unifund SAL, 910 F.2d 1028, 1037 (2d Cir. 1990).

With respect to an ancillary remedy, such as the freezing of a defendant's assets, a proper showing does not require proof of the elements of a traditional SEC injunction. S.E.C. v. Unifund SAL, 910 F.2d at 1041 (internal citations omitted); see also SEC v. Commonwealth Chemical Securities, Inc., 574 F.2d 90, 103 n. 13 (2d. Cir. 1978) (approving disgorgement remedy despite failure to show likelihood of recurring violation). "The decision to continue a temporary freeze on [the] Defendants' assets requires particularly careful consideration by the Court." S.E.C. v. Prater, 289 F. Supp.2d 39, 49-50 (D. Conn. 2003) (citing SEC v. Manor Nursing Ctrs., Inc., 458 F.2d 1082, 1105 (2d. Cir. 1972)). "District Courts have broad equitable powers to grant ancillary relief ... where necessary and proper to effectuate the purposes of the securities laws." Id (quoting SEC v. Economou, 830 F.2d 431, 438 (2d. Cir. 1987)(internal quotation marks omitted). The court must balance the necessity to freeze assets so as to prevent disgorgement against the possibility that the freeze itself will cause a disruption to the defendants' legitimate business affairs. Prater, 289 F. Supp. 2d at 50; Manor Nursing, 458 F.2d at 1086.

**DISCUSSION**

I. **Traditional SEC Injunction**

  A. **Prima Facie Case of Violations of the Securities Laws.**

The SEC argues that four points tip the scale in their favor of a proper showing for a *prima facie* case that McGinnis and Pugach violated the securities laws by insider trading: 1) McGinnis had access to and did access material non-public information at GMCR; 2) the defendants were longstanding friends and "trading partners" who often communicated through their cell phones and Facebook pages as well as in person; 3) the defendants shared investment strategies; and 4) the defendants realized extraordinary profits through risky and suspicious trading in GMCR stock.

McGinnis responds that the SEC has failed to establish its *prima facie* case because there is a huge gap in the evidence. Specifically, McGinnis makes five points that he argues are inconsistent with the actions of one who has inside information: 1) the defendants conducted extensive research; 2) the defendants employed hedging strategies such as "straddling" and "strangling;" 3) the defendants lost money in some quarters; 4) McGinnis conducted more trading outside of earnings than inside; and 5) McGinnis

10

made money outside earnings, which showed trading skills.

Pugach also responds, stating that the SEC has put forward complex, circumstantial evidence without evincing a "smoking gun." Pugach states that negative injunctions, like the one at issue here, require a high standard of a strong likelihood of success on the merits and a likelihood of repetition of violating securities laws, which, in this case, is virtually nonexistent. In terms of the asset freeze, Pugach argues that the interest of the government does not outweigh the extreme burden placed upon the defendants.

To demonstrate a *prima facie* case, the plaintiff must demonstrate the defendants: 1) obtained material, nonpublic information[8] intended to be used only for a proper purpose and 2) misappropriated[9] or otherwise misused that information with 3) scienter,[10] in breach of a fiduciary duty, or other duty arising out of a relationship of trust and confidence, to make "secret profits" by trading or

---

[8] Information is material "if there is a substantial likelihood that a reasonable investor would view it as significantly altering the 'total mix' of information available." S.E.C. v. Gonzalez de Castilla, 145 F. Supp.2d 402, 411-14.

[9] Liability attached when a defendant "misappropriates material nonpublic information in breach of a fiduciary duty or similar relationship of trust and confidence and uses that information in a securities transaction." S.E.C. v. Falbo, 14 F. Supp.2d 508, 519 (S.D.N.Y. 1998).

[10] Scienter is a state of mind that embraces the intent to deceive, manipulate or defraud. Gonzalez de Castilla, 145 F. Supp.2d at 414.

tipping others. S.E.C. v. Gonzalez de Castilla, 145 F. Supp.2d 402, 411-14 modified in part sub nom. S.E.C. v. Duclaud Gonzalez de Castilla, 170 F. Supp.2d 427 (S.D.N.Y. 2001) (citing Dirks v. SEC, 463 U.S. 646, 654 (1983); *United States v. Newman,* 664 F.2d 12 (2d Cir.1981)).

Here, the defendants do not contest the fact that the GMCR computer system contained material, nonpublic information if used when trading.[11] Information to which McGinnis conceded he had *access*, and to which he is alleged to have *accessed* by the SEC, was, *inter alia*, final drafts of GMCR earnings announcements. When these earnings announcements were published there was a high probability that stock price of GMCR would react in a significant way. Additionally, while there may be some disagreement about the information of the sales portal page, McGinnis does not argue that information the SEC alleges that he accessed was nonpublic. The earnings announcement drafts, for example, would have not been widely disclosed before the official announcement and were only known to some GMCR employees.

At the very least, the SEC has shown that: 1) as an employee of GMCR, McGinnis had access to material, non-

---

[11] However, McGinnis argues that some information on the "sales portal" page may not be nonpublic information, and even it is, would only be a "tiny piece of the picture" for GMCR sales information.

public information; 2) McGinnis traded GMCR stock in violation of GMCR policy; 3) McGinnis and Pugach communicated frequently, often discussing trading strategies, which included conversations in the days leading up to GMCR earnings announcements; and 4) the defendants realized extreme profits as a result of trading in GMCR. Thus, the court concludes that the evidence is sufficient to establish a likelihood of success on the merits.

### B. Reasonable Likelihood that the Defendants will Continue to Commit Violations

The SEC argues "the illegal conduct has been repeated for thirteen quarters going back to the summer of 2010." The plaintiff cites S.E.C. v. Mgmt. Dynamics, Inc., 515 F.2d 801, 807 (2d Cir. 1975), for support of their proposition that the defendants will continue to commit violations. Specifically, the plaintiffs argue "the conduct involved the highest degree of scienter: Mr. McGinnis has secretly stolen information from his long-time employer in order to make millions of dollars of illegal profits." The SEC contends that these actions show a likelihood of future violations because the defendants will likely use any inside information they can lay their hands on.

13

The defendants respond that where the alleged tipper, McGinnis, who is only alleged to have had access to GMCR inside information, but is no longer employed by GMCR, and no longer has such access, there is no likelihood of repetition in this case.

In analyzing a likelihood of committing future violations, a court should consider several factors, including: (1) the degree of scienter; (2) the isolated or recurrent nature of the infraction(s); (3) the defendant's recognition of the wrongful nature of his conduct; and (4) the likelihood that the defendant will have the opportunity to commit future violations. S.E.C. v. Falbo, 14 F. Supp. 2d 508, 529 (S.D.N.Y. 1998). "[F]actors suggesting that the infraction might not have been an isolated occurrence" are relevant in determining whether the defendant is "likely to repeat the wrong". Mgmt. Dynamics, Inc., 515 F.2d 801, 807

Here, while there is a reasonable inference for the court to conclude that the defendants operated with a reasonable degree of scienter in making vast profits with GMCR inside information on several occasions; the act was isolated in the sense that it was in one stock, in a company in which McGinnis is no longer employed. In other words, the fox is out of the henhouse and the henhouse is

now locked. The defendants in this case, as the government itself argues, are not Wall Street big shots with vast connections, but are amateurs, successful in one corporation's stock because one of them allegedly had inside information in that corporation.

The court concludes that the SEC has failed to prove a reasonable likelihood that the defendants will continue to commit the alleged violations. Therefore, the traditional SEC injunction in this case, enjoining the defendants from violations of federal securities laws, is hereby lifted. Specifically, the court amends the TRO such that sections I and II are no longer in effect. Section IV, involving the destruction of records, shall remain in full force and effect.

## II.  Asset Freeze

The SEC argues that the defendants can, and would have an incentive to, move their assets beyond the reach of the court, which is why the asset freeze needs to continue in place. Regardless, the SEC argues its "burden to obtain an asset freeze – which merely preserves the status quo – is lower."

Pugach responds that the SEC carelessly listed $1,250,000 in withdrawals to show that Pugach would dissipate his money without researching where nearly all that money withdrawn went – to pay his state and federal taxes on trading gains. Specifically, Pugach argues he has no intent to dissipate his assets, and has submitted to the jurisdiction of the court, responding honestly to the merits of the case, and has gone beyond what was required of him in discovery. Likewise, McGinnis argues he has no intent to dissipate his assets.

"Unlike the injunction against securities law violations, the freeze order does not place appellants at risk of contempt in all future securities transactions. It simply assures that any funds that may become due can be collected." Unifund SAL, 910 F.2d at 1041. Thus, "Congress has authorized the Commission to obtain preliminary injunctive relief upon a 'proper showing,' and it is a matter of federal law whether the showing the Commission has made is sufficient to support an interlocutory freeze order. Id. (quoting Cf. FTC v. H.N. Singer, Inc., 668 F.2d 1107, 1112 (9th Cir. 1982) (finding unavailability of attachment did not preclude other provisional remedies).

The asset freeze contained in section III of the TRO, which the SEC seeks to continue, provides as follows:

> "The assets, funds, or other property of Defendant McGinnis up to the amount of $15,434,506,[12] wherever located, are frozen. The assets, funds, or other property of Defendant Pugach up to the amount of $20,369,352,[13] wherever located, are frozen. The assets, funds, or other property of Relief Defendant Pugach up to the amount of $38,565[14] wherever located, are frozen."

Two modifications to the TRO have been proposed and granted by the court for each of the defendants. The first and second modifications[15] of the TRO for McGinnis included, *inter alia*, the release of $75,000 and $100,000 for reasonable attorneys' fees; $4,490 and $6,586.53 for necessary ordinary living expenses; $6,765.22 for health insurance; and $247,555.38 for necessary construction expenses. The first and second modifications[16] of the TRO for Pugach included, *inter alia*, the release of $75,000 and $100,000 for reasonable attorneys' fees, and $4,031 and for necessary ordinary

---

[12] As the tipper, the amount reflects what the SEC alleges is equal to Mr. McGinnis and Mr. Pugach's illegal profits ($7,677,880) added to a civil penalty of three times the amount of his profits ($7,756,626).
[13] As the tippee, the amount reflects what the SEC alleges is equal to Mr. Pugach's illegal profits ($5,092,338) added to a civil penalty of three times the amount of his profits ($15,277,014).
[14] As the relief defendant, the amount reflects what the SEC alleges are her ill-gotten gains of $38,565.
[15] These modifications were ordered on August 15, 2013, and October 22, 2013, respectively.
[16] These modifications were ordered on August 19, 2013, and October 22, 2013, respectively.

living expenses.

The SEC certainly has a legitimate interest in ensuring the alleged ill-gotten profits are not dissipated beyond the reach of the court. However, the court balances the equities in ruling on this preliminary injunction, and considers the extreme burden that the asset freeze places on the defendants and their families. The court concludes that the TRO shall remain in effect, with the aforesaid funds and other assets in section III of the TRO remaining frozen, subject to the previous modifications by the court (docket numbers 30, 34, 59, and 60). The TRO, however, should not be so onerous. Specifically, the court amends section III and releases $7,500 in funds to each defendant on a monthly basis so that they have the ability to maintain their necessities of living during the pendency of this case. Further, Pugach shall be given immediate access to $75,500.89, the amount of funds indicated in his motion for modification of the TRO required for unpaid balance of legal fees and costs (docket number 78). McGinnis shall file, within 10 days of this order, an affidavit as to reasonable counsel fees due and owing.

## **CONCLUSION**

For the foregoing reasons, the SEC's motion for preliminary injunction (document no. 3) is GRANTED in part and DENIED in part. The preliminary injunction shall remain in effect until entry of a final judgment in, or other disposition of, the action.

It is so ordered this eleventh day of December, 2013, at Hartford, Connecticut.

```
                              _____/s/_____
                              Alfred V. Covello,
                              United States District Judge
```